## HAUPT *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 85. Argued November 10, 1920.—Decided December 6, 1920.

Appellant sued to recover a large sum of money for the use which he claimed the Government had made of his patented improvements in dikes and breakwaters in the construction of jetties, which, with dredging, had resulted in rendering navigable to seagoing vessels the channel of Aransas Pass, on the coast of Texas. *Held,* that the appropriation acts evinced the willingness of Congress to expend money in testing his patented devices, but no intention to pay him until their usefulness should be proved; and that no promise of the Government to pay him for the use made could reasonably be implied. P. 278.

53 Ct. Clms 591, affirmed.

THE case is stated in the opinion.

*Mr. Benjamin Carter,* with whom *Mr. George Ramsey* was on the brief, for appellant.

*Mr. Daniel L. Morris,* Special Assistant to the Attorney General, with whom *Mr. Assistant Attorney General Davis* and *Mr. Edward G. Curtis,* Special Assistant to the Attorney General, were on the brief, for the United States.

MR. JUSTICE CLARKE delivered the opinion of the court.

Aransas Pass is an inlet, naturally too shallow for ocean navigation, connecting the waters of the Gulf of Mexico and those of Aransas Bay and the Bay of Corpus Christi on the coast of Texas. The problem of obtaining a navigable channel through this Pass occupied the attention of the Government and of private enterprise for many

years prior to 1912, when a channel of the desired depth of twenty feet was obtained.

This is a suit instituted by the appellant, Haupt, a distinguished engineer and the patentee of improvements in dikes and breakwaters, to recover a large sum of money for the use which he claims the Government made of his invention in the construction of jetties, which, with dredging, resulted in the creating of the Aransas Pass channel in 1912. The Court of Claims dismissed the petition holding that no contract, express or implied, with the United States was shown for the use of appellant's patented invention and that it was therefore without jurisdiction.

A resumé of what was done in the effort to procure the channel, which is necessary to a decision of the case, will develop the relations of the appellant to the enterprise and to the Government on which he bases his claim.

Between 1880 and 1889 the United States Government constructed what is designated in the record as the "Mansfield Jetty," 5,500 feet in length, designed to deepen the channel through the Pass,—but it had no appreciable effect on the depth of water and the work was suspended in 1889.

In 1890 the State of Texas chartered the Aransas Pass Harbor Company, a private corporation, organized for the purpose of improving the channel at Aransas Pass, and in the same year Congress authorized the company to construct such jetties and breakwaters as might be necessary to create and permanently maintain a navigable channel "across the outer bar, which obstructs the entrance to Aransas Pass Harbor." This company built the jetty designated in the record as the "Nelson Jetty," about 1,800 feet in length, which also failed to deepen the channel and was abandoned in 1893.

In 1894 another act of Congress granted an extension of time to the same company to further pursue its objects, and at this point in the history the appellant appeared

with United States Patent No. 380,569 for certain improvements in dikes and breakwaters for improving the channels of rivers and harbors.

In the view we take of the case it will be a sufficient statement of the principle involved in, and of the claims of, appellant's patent to say that the inventor aimed to accomplish results with a single jetty, of a form specially adapted to each locality, which had theretofore been accomplished only with two or more jetties. The claims are variously worded, as usual, but the substance of the alleged discovery is, that the study of the conformation of the bottom and shores of a given locality and of the prevailing currents, tidal and other, will enable one skilled in the art to so apply the principles disclosed in the patent as to give such form and location to a single breakwater or jetty that it will "cut the advancing waves" and "resist and decompose the flood resultant" in such manner that, without the aid of a second jetty or of dredging, it will scour out and maintain a channel of the required depth in a designated location.

The appellant granted a license to the Aransas Pass Harbor Company to use his patented device or design, on condition that the work should be done under his supervision, and he thereupon prepared the necessary plans and drawings for the construction which he thought would effectuate the desired result. The cost of the jetty, as thus designed by the appellant, was too great for the resources of the company and, upon request, he eliminated a portion of it which reduced the estimated cost by one-half. The jetty thus modified consisted of a reverse curve or letter S and a contract for the construction of it was let in July, 1895. Work was prosecuted vigorously until the following January, by which time it was ascertained that a portion of the first, the "Mansfield Jetty," which had been reported officially as having disappeared, was still in place and in such a position, it was claimed, as to

prevent free erosion by the currents as they had been and would be modified by the new jetty under construction. Thereupon a contract was let for the removal of a part of the "Mansfield Jetty," but in May, 1897, before the new jetty was completed or the old one removed, all work was suspended.

This suspension in the month of May, 1897, marks the end of the effort to obtain the desired channel through private enterprise, and Congress, in May of the following year, by resolution called upon the Secretary of War to prepare and submit plans for the deepening of the Pass to at least twenty feet. Six months later a board created by the War Department reported in favor of two jetties, to be supplemented by dredging. It was recommended that the northerly jetty should be located substantially upon the line of the one partially constructed by the Aransas Pass Harbor Company, and the other some distance southerly from it.

While the subject was thus before Congress, appellant brought his plan for dealing with the problem to the attention of the committee, and proposed to enter into a contract to construct and maintain the desired channel for a much less sum of money than the estimated cost of the work recommended by the War Department board. His proposition was given serious attention and, although it was rejected, he was assured by members of the congressional committee that they desired to give his plan a trial,—as well they might, for, if it had proved successful, it would have resulted in a great saving to the Government in dealing with many like situations and problems.

Before any further work was done, the Aransas Pass Harbor Company conveyed to the United States the jetty or breakwater, which we have seen was constructed as designed by appellant, and Congress, in 1899, appropriated $60,000 for dredging and improving the Pass, but with the proviso that the Secretary of War was authorized "to

contract for the removal of that portion of the old Government jetty [the Mansfield Jetty] in said harbor from the end nearest the curved jetty" constructed by the Aransas Pass Harbor Company, but in such manner as not to interfere with that jetty. This is a plain indication of interest on the part of Congress in appellant's theory or method of dealing with the problem, for he was claiming that the old jetty constituted an obstruction to the action of the water and prevented the jetty which the Harbor Company had built under his direction from scouring out the desired channel.

That appropriation was expended and three years later, in 1902, Congress appropriated $250,000 for continuing the improvement of the Pass, but again with the proviso "that the work at this harbor shall be confined to the completion of the north jetty in accordance with the design and specifications of the Aransas Pass Harbor Company, and in continuation of the work heretofore carried out on said jetty by said company."

Here again is plainly evidenced the purpose of Congress to give appellant's theory a full and fair trial, for, it should be noted, as yet it had never been reduced to actual practice.

Plans and specifications for the contract under this second appropriation were drawn by the Government engineer in charge and were by him submitted to the Aransas Pass Harbor Company and the appellant suggested amendments, which were adopted. Among other things done under this contract was the removal of a considerable part of the Mansfield Jetty which the appellant had claimed so affected the action of the currents as to prevent the obtaining of the desired results from his construction.

Three years later, in 1905, Congress appropriated a further sum of $100,000, and in 1906 a like amount, for the improvement of the Pass and in each case the provision was incorporated that the money was to be applied to

construction "in accordance with the design and specifications of the Aransas Pass Harbor Company, and in continuation of the work heretofore done."

The findings of the Court of Claims are: that in compliance with the provisions of these various acts the work of improvement was continued and completed in 1906, in accordance with the plans and specifications, as modified by appellant; that from 1896 to 1906 the depth and width of the channel were variable and shifting, with a ruling depth of only six feet of water in 1908; and that the evidence does not show to the satisfaction of the court that the so-called Haupt jetty, which was constructed under appellant's direction, "did produce, or would have produced, a navigable channel of the necessary or proper depth and width for navigation purposes."

It is upon the terms in which the three appropriations were made in 1902, 1905 and 1906, each for the construction or completion of the project "in accordance with the design and specifications of the Aransas Pass Harbor Company," that the appellant relies, and from them it is argued that a contract to pay him for the use of his design and for the impairment of his patent should be derived. But we not only have the Court of Claims finding that the experiment of attempting to procure the desired channel by appellant's method and under his plans, pursued through many years and definitely for four years, from 1902 to 1906, at an expense to the Government of $450,000, resulted in failure, but we have the further action of Congress, next to be described, which clearly shows the correctness of the court's conclusion.

In March, 1906, as we have seen, the work of improvement according to the plans as modified by the appellant was completed without securing the required channel. In the following December, a board, appointed by the War Department to further consider the Aransas Pass project, recommended that the spacing which Haupt had left

between the end of his jetty and St. Joseph's Island, for its influence on the currents, should be closed and that a parallel jetty should be built to the south of the Haupt jetty, thus making the project one of two jetties, instead of the single jetty of appellant's plan.

In 1907 Congress appropriated $200,000, and authorized contracts for the additional amount of $290,000 for improving the Pass "in accordance with the plans submitted in its report of December twenty-second, nineteen hundred and six, by the Board of Engineers created by authority of [the] Act of June thirteenth, nineteen hundred and two." It will be seen that all reference to appellant's method of solving the problem disappeared from this act, which adopted the new plan of solution.

Contracts were made under this appropriation of 1907 and a second jetty, generally parallel to the Haupt jetty, was commenced in March, 1908, and completed in 1911. The Court of Claims finds: that, beginning with 1912, coastwise and seagoing vessels have been going through the Pass and that in that year the port of "Aransas Pass" was given the status of a commercial port on a par with Galveston by the Railway Commission of Texas; that "dredging was necessarily done in the years 1912 and 1915, inclusive, to maintain a proper navigable depth of channel in the pass"; and that this construction as ultimately completed "did not embody any of the devices of the plaintiff's [appellant's] letters patent No. 380,569."

It is, of course, essential to recovery by appellant on a *quantum meruit*, that he should prove a contract express or implied, on the part of the Government to pay him, that his patented method of construction was used, and what the value of it was. *Gibbons* v. *United States*, 8 Wall. 269; *Ball Engineering Co.* v. *White. & Co.*, 250 U. S. 46. The three acts requiring the money appropriated to be used in accordance with the design and specifications of the Aransas Pass Harbor Company, which were prepared by

appellant, implied clearly that Congress intended to give the experimental construction of appellant a fair trial and common honesty would infer a disposition, but not a contract, to pay for the use of the patented form of construction, if it should be found to be valuable. But, saying as much as it did, the failure of Congress to say more imports a determination on its part to hold within its discretion the decision as to the usefulness of appellant's ideas and as to what, if anything, should be paid for them. The absence of any reference to appellant or to his patent and of any words implying a contract to pay him, from the three acts of Congress in which reference is so distinctly made to the specifications embodying his ideas, is unmistakable evidence that Congress deliberately dealt with appellant's theories as still in the experimental stage, and that it was willing to use the public money to give them a trial in practice, but that payment for them was reserved for consideration until their usefulness should be established,—and this, the finding by the Court of Claims shows, was never done.

For these reasons, to the sufficient finding that the construction which produced the desired channel did not embody any of the devices of the appellant's patent, we must add that the record fails wholly to show anything from which a promise by the Government to pay for the use of such devices can reasonably be implied, and therefore the judgment of the Court of Claims must be affirmed.

Being of opinion that our conclusion would not be affected by any findings to be made on the points asked for in the appellant's motion to remand for additional findings of fact, that motion is denied.

*Affirmed.*